IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GARRY EAGLE and HEATHER          :
EAGLE                            :
                                 :
          Plaintiffs,            :     Case No. 4:03-CV-110
                                 :
     vs.                         :     (Judge Jones)
                                 :
SCHNEIDER NATIONAL               :
CARRIERS, INC.                   :
                                 :
          Defendant.             :

## MEMORANDUM AND ORDER

### August 19, 2005

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court is a Motion for a Post-trial Relief filed by

Defendant Schneider National Carriers, Inc. ("Defendant" or "Schneider National").

(Rec. Doc. 84).  Plaintiffs Garry and Heather Eagle ("Eagles" or "Plaintiffs") have

filed a timely response.  We held oral argument on Defendant's Motion on January

27, 2005.  The Motion is now ripe for disposition.

For the following reasons, we will deny the Defendant's Motion.

## PROCEDURAL HISTORY & STATEMENT OF FACTS:

The facts of this case are well known to the parties and we will only briefly

1

restate them here.

On August 22, 2002, the Plaintiffs' vehicle and Defendant's tractor-trailer were involved in an accident at approximately 10:40 P.M. on State Road 655 in Mill Creek, Huntingdon County, Pennsylvania.  Plaintiff Heather Eagle suffered significant injuries to her left arm and lower extremities.  She was airlifted for immediate treatment at the trauma center of Altoona Hospital in Altoona, Pennsylvania, and thereafter had an extended hospital stay and multiple medical procedures.

Following a jury trial held in the United States District Court for the Middle District of Pennsylvania from March 7, 2005 through March 16, 2005 a unanimous verdict was returned in the Plaintiffs' favor.  The jury responded via the verdict form that the Defendant was 85% negligent and that Plaintiff Heather Eagle was 15% negligent in causing the August 2002 accident.  The jury then awarded Plaintiff Heather Eagle $3,250,000.00 in damages, and Plaintiff Garry Eagle $2,500.00 in non-loss of consortium damages and $2,500.00 in loss of consortium damages. (Rec. Doc. 78).  By application of the comparative negligence percentage as determined by the jury, Heather Eagle's award was reduced to $2,762,500.00 and Garry Eagle's loss of consortium award was reduced to $2,125.00 (Garry Eagle's non-loss of consortium damages remained $2,500.00).  (See Rec. Doc. 82).

2

Subsequent to the entry of judgment, the Defendants filed the instant Motion seeking a new trial, judgment as a matter of law, remittitur of the judgment, or a new trial on damages only.[1]

**STANDARD OF REVIEW:**

Our inquiry begins with the appropriate Federal Rule of Civil Procedure. Rule 50 provides a basis for a party to renew after the jury's verdict its previously filed motion for judgment as a matter of law.  In relevant part, it provides:

(b)     Renewing Motion for Judgment After Trial; Alternative Motion for New Trial; Conditional Rulings.

> If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment -- and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:
>
> (1) if a verdict was returned:
>
>> (A) allow the judgment to stand,
>>
>> (B) order a new trial, or
>>
>> (C) direct entry of judgment as a matter of law;

---

[1] The Plaintiffs have filed a Motion for Delay Damages (Rec. Doc. 83).  As that Motion is not yet ripe, it will be resolved by a separate order.

Fed.R.Civ.P. 50(b).

Rule 59 provides a basis for determining whether a new trial is appropriate.

In relevant part, it provides:

> (a) Grounds.
>
>> A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; ....
>
> (b) Time for Motion.
>
>> Any motion for a new trial shall be filed no later than 10 days after entry of the judgment.
>
> ...
>
> (e) Motion to Alter or Amend a Judgment.
>
>> Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment.

Fed.R.Civ.P. 59.

When resolving a motion for a new trial, "where a contention for a new trial is based on the admissibility of evidence, the 'trial court has great discretion.'" <u>Link v. Mercedes-Benz of North America, Inc.</u>, 788 F.2d 918, 921-22 (3d Cir. 1986) (<u>quoting</u> <u>Kane v. Ford Motor Co.</u>, 450 F.2d 315, 316 (3d Cir. 1971)). Conversely,

4

if a motion requests a new trial because the verdict was against the weight of the evidence, our discretion is much narrower.  In such a situation, we may only grant a new trial when the jury's verdict resulted in a miscarriage of justice, or where the verdict "cries out to be overturned or shocks the conscience."  Williamson v. CONRAIL, 926 F.2d 1344, 1353 (3d Cir. 1991).

**DISCUSSION:**

We will treat Schneider National's Motion as a combined motion for omnibus relief, in that it contains four separate grounds for relief.  Defendant's first prayer is for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, on the basis that the verdict inter alia held Defendant liable against the weight of the evidence.  Second, Defendant moves for a new trial pursuant to Rule 59, alleging inter alia that the Court impermissibly admitted certain evidence during the trial.  Third, Defendant moves for a new trial as to damages only pursuant to Rule 59(b).  Finally, Defendant moves for remittitur pursuant to Rule 59(e).[2]

**A.   Motion for a New Trial**

---

[2] Although Defendant's Motion (Rec. Doc. 84) also requests judgment as a matter of law, this issue is not addressed within its supporting memorandum of law.  (See Rec. Doc. 101).  To the extent that it is necessary to reach this additional ground asserted by Defendant, which may well have been waived by Defendant's failure to state any argument in support thereof, we will note that it is denied.

Defendant's Motion for a New Trial contains four separate arguments.  The first three involve questions of evidentiary rulings made at the time of trial and/or the admission of evidence that was, allegedly, in plain error.  In its fourth argument, Defendant contends that a new trial is warranted because the jury's apportionment of liability was inconsistent with the evidence.

## 1.    Alternate Route / Choice of Paths Evidence

Defendant first contends that the Court impermissibly allowed evidence to be heard by the jury that Defendant's driver, Jay Irvin, could have operated its tractor trailer on an alternate, and possibly safer, route.  At trial, counsel for the Plaintiffs questioned several witnesses about the nature of the roadway, Route 655, on which the accident occurred.  These witnesses compared Route 655 to Route 522/22, a highway that runs parallel to Route 655.  (See Pls.' Trial Ex. 127)(a Pennsylvania roadmap indicating that Route 655 and Route 522/22 run roughly parallel in Huntingdon County, Pennsylvania).

The first witness to testify was Pennsylvania State Police ("PSP") Trooper Robert A. Lenhart, Jr. ("Trooper Lenhart") who had responded to the scene of the accident.  He testified that Route 522, known as the William Penn Highway, was marked with a red line and Route 655 was marked with a black line on the standard Pennsylvania roadmap.  He was then asked  about the difference between the two

6

roads:

| | |
|---|---|
| Question: | Officer, do you know if that makes–what designation that is between roads that are colored red [on the map] as compared to those that are black. |
| Answer: | I personally take that to mean that that is a larger road. |
| Question: | As compared to a–black-lined roads. |
| Answer: | Right. |

(Trial Tr. vol. 1, 59, March 7, 2005).  Thus, the jury heard testimony that Trooper Lenhart believed that Route 522/22 was larger than Route 655.  Trooper Lenhart illustrated this to the jury via the aforementioned roadmap.  (Pls.' Ex. 127).

   Also testifying about these two roadways was Schneider National's driver, Jay Irvin.  He was asked a number of questions on cross-examination about Route 655 and why he chose to travel on that route as opposed to Route 522/22.  For example, Irvin was asked the following:

| | |
|---|---|
| Question: | Sir on this state – on this official transportation map that we're looking at, do you see the designation of a red road here, which is the same red road that we're talking about that 522 is? |
| Answer: | Yes, it's a major through traffic route. |
| ... | |
| Question: | And that would be designated as major through road, a major road? |

7

Answer:      Yes.

(Trial Tr. vol. 5, 102; March 14, 2005).  After extensive cross-examination on this subject by Plaintiffs' counsel which extends over approximately seven pages of the trial transcript (and after the testimony from all other fact witnesses), defense counsel finally interposed the following objection to this line of questioning:

| | |
|---|---|
| Def.'s Counsel: | Your Honor, I'm going to object to the relevancy of all this. |
| Pls.' Counsel: | Well, Your Honor -- |
| The Court: | You want to tie it up. |
| Pls.' Counsel: | I am ready to tie. |
| The Court: | I'll overrule the objection -- |
| Pls.' Counsel: | Thank you, Your Honor. |

(Id. at 106); (see also id. at 99-107).  Nowhere at that point or elsewhere did counsel for the Defendant suggest that this line of questioning was at all prejudicial or that it should be barred or stricken.  Nonetheless, in its Motion, Defendant contends that the admission of the testimony about Route 655 being smaller than Route 522/22 is plain error such that a new trial is warranted.  As the referenced objection occurred after nearly all of the subject testimony had already been admitted, we must review the admission of this evidence under the high "plain

error" standard.  Fed.R.Evid. 103(d)(providing that even in the absence of an

objection, "plain errors affecting substantial rights" can be corrected).  Three

elements must be shown to establish plain error: (1) an error, (2) that is plain; and,

(3) that affects substantial rights.  United States v. Moore, 375 F.3d 259, 262 (3d

Cir. 2004).

　　　According to Defendant, the basis of the alleged error is what is known as

the "alternate route" or "choice of paths" doctrine.  We will first observe that this

doctrine has rarely been used or cited in Pennsylvania jurisprudence.  The "choice

of paths" doctrine states that:

> There is no law which requires anybody to follow any particular
> course in reaching his destination.  People have freedom of
> movement in this country and they may even follow whim or
> caprice in attaining their objectives.  Even if the alternative
> course could not be determined hypothetically safer but the one
> chosen is still free of hazard and authorized by law, a tortfeasor
> may not escape responsibility for his negligence by maintaining
> that the person injured through his (the tortfeasor's) negligence
> could have escaped injury by taking the alternative route.

Parnell v. Taylor, 403 A.2d 100, 104 (Pa. Super. Ct. 1979)(quoting Hopton v.

Donora Borough, 202 A.2d 814, 815-16 (Pa. 1964).  The choice of paths doctrine

has historically been asserted by a defendant attempting to argue that a plaintiff was

contributorily negligent for choosing a less safe route.  In the instant case,

Defendant contends that Plaintiff used the doctrine to show that Defendant was

liable because its driver chose a smaller, and thus less safe road as opposed to a larger highway.

In Pennsylvania, we are unable to locate a single case, nor has Defendant cited us to one, where the "choice of path" doctrine has been asserted by a **plaintiff** in aid of its case, as Defendant alleges Plaintiffs did here.  Rather, the doctrine has consistently been asserted by **defendants** attempting to establish the contributory negligence of a plaintiff.  For example, in <u>Parnell</u>, the defendant tortfeasor attempted to show that the plaintiffs' decedent had chosen a less safe route on which to ride his bike.  <u>Parnell</u>, 403 A.2d at 100.  Similarly, in <u>DeFonde v. Keystone Valley Coal Co.</u>, the defendant was permitted to use a "choice of path" defense to show that the plaintiff was contributorily negligent by walking in the path of a bulldozer's moving rear shovel rather than in front of the bulldozer.  126 A.2d 439, 440 (Pa. 1956).

Both at oral argument and within his submissions, defense counsel was unable to direct us to any case or precedent within which the "choice of paths" doctrine operated in the manner he suggests that it should here.  In its brief, Defendant deflects this issue to the following footnote, where it argues that we are to overlook this difference:

Although the 'choice of paths' argument most often arises as a

> defense in the context of contributory negligence, plaintiff's use of this
> theory [in this] case should be subject to the same requirements and
> scrutiny because plaintiffs also sought to create an inference that
> defendant's selected route reflected a breach of his duty of care.

(See Def. Br. Supp. Mot. New Tr. at 7 n.4).  While we grant that this is a creative

argument in favor of reversing the doctrine's usual application, we decline

Defendant's invitation to do so.

Further, even if we were inclined to extend the "choice of paths" doctrine to

Plaintiffs, which as noted we are not, the admission of the evidence at trial which

Defendant finds problematic was not improper in the context of the entire record.

Notably, Plaintiffs' counsel did not interpose any argument regarding the route taken

by Mr. Irvin in his closing argument, and no reference to it was included in our

instructions to the jury.  To the extent that the "choice of paths" doctrine is at all

relevant here, we have observed that in the few cases in which it has arisen, the issue

involved a requested charge to the jury on the doctrine.  See Parnell, 403 A.2d at

100.  While the evidence of Mr. Irvin's path of travel had borderline relevance, its

inclusion in the record was innocuous in the context of the whole trial, and it was

certainly not prejudicial to the Defendant to the degree that it suggests.

Therefore, as we do not find that this evidence was admitted in error, plain or

otherwise, we need not reach the question of whether there was an affect on

Defendant's substantial rights.  This portion of Defendant's Motion shall accordingly be denied.

### 2.   Testimony of Wayne Waite

Defendant next asserts what we must deem a rather curious argument via which it contends that at trial we impermissibly allowed Plaintiff Heather Eagle's father, Wayne Waite, to testify as an expert regarding the medical treatment and rescue services received by his daughter Heather Eagle.  Mr. Waite, an emergency medical technician ("EMT") and registered nurse ("RN") was one of the first individuals to respond the scene of the subject accident, as he lived approximately one mile from Cramer Hill, where the accident occurred.  As such, he testified as a fact witness concerning both the events at the accident scene as witnessed by him, and Plaintiff Heather Eagle's recuperation, which he also took part in as a father with evident and appropriate concern for his daughter's well-being.

Defendant alleges that at times, the nature of Mr. Waite's testimony crossed over from fact testimony to expert testimony, and that it was therefore prejudicial. During the trial, Defendant raised the following objection to Mr. Waite's testimony:

> Def.'s Counsel:   Objection, Your Honor. I don't think that Mr. Waite should be able to testify to what the doctor did during these procedures.  We're going to hear from Dr. Fulchiero by videotape deposition.

> The Court:          Well, you should rephrase.  I'll sustain the objection.  He
>                     can testify to some degree because of his knowledge as a
>                     nurse as to things that are perhaps beyond a layperson,
>                     but when we get into the surgical area I think the objection
>                     is appropriate.  So we'll sustain that. You can rephrase.

(Trial Tr. vol. 2, 156, March 8, 2005).  Our ruling at trial is in accordance with the

Federal Rules of Evidence.  Under Rule 602, a fact witness can only testify about a

subject if evidence has been introduced to establish that he has personal knowledge

of the matter.  Further, Rule 701 limits the scope of a fact witness's testimony:

> If the witness is not testifying as an expert, the witness' testimony in
> the form of opinions or inferences is limited to those opinions or
> inferences which are (a) rationally based on the perception of the
> witness, and (b) helpful to a clear understanding of the witness'
> testimony or the determination of a fact in issue, and (c) not based on
> scientific, technical, or other specialized knowledge within the scope
> of Rule 702.

Fed.R.Evid. 701.  Therefore, expert witnesses are permitted to go further and to

offer their opinions on issues relevant to their expertise.  The difference between

these two types of witnesses is that the latter must be qualified by the court and

accepted as an expert in a specific area.

Having reviewed Mr. Waite's testimony in its entirety, we see no evidence

whatsoever that his testimony transcended the prohibitions contained in Rules 602

or 701.  Defendant's suggested reading of Rule 701 is unrealistically narrow, and

overlooks the fact that as a trained EMT Mr. Waite was fully competent to explain

13

the rescue and life-saving measures being utilized at the accident scene involving his daughter, as witnessed by him.  Mr. Waite expressed no opinions either expert or otherwise in this regard, but merely testified as to what he saw.  Moreover, the subject of his testimony was never in dispute in this case.

Mr. Waite also testified concerning what he observed during the subsequent medical treatment of his daughter.  As noted, he is an RN, and thus he simply described rather simple medical procedures as he witnessed them, without rendering any opinions as to the treatment.  When we believed that his testimony was problematic as it related to surgical procedures, we sustained Defendant's objection. Again, the fact that Plaintiff Heather Eagle had received the subject medical treatment was never controverted by Defendant.

Mr. Waite was never offered, nor did he testify, as an expert in this case.  At bottom, Defendant is arguing that it was prejudicial and inflammatory to allow a father who witnessed his daughter's extraction from her car at an accident scene and subsequent medical treatment to testify at trial.  Notably, when pressed by us at oral argument, Defendant's counsel could not elucidate precise reasons why he believed that Mr. Waite's testimony was in fact harmful or prejudicial.  To reiterate, Mr. Waite's testimony involved matters which in the main were in no way contested by Defendant.  As a result, the portion of Defendant's Motion concerning Mr. Waite's

14

testimony will be denied.

### 3.      Position of the Defendant's Tractor Trailer After the Accident

Defendant next alleges that testimony about the position of its tractor trailer

after the accident was admitted in error.  Defendant explains that:

> the admission of this evidence allowed the jury to improperly infer that
> the trailer crossed the centerline of the road when the accident
> occurred and ... created an unfair prejudice to defendant, confusion of
> the issues and [a] potential to mislead the jury ... .

(Def.'s Mot. Post-Trial Relief ¶ 26(c)).

During the trial, counsel for the Plaintiffs asked several witnesses who were at

the scene of the accident about the final resting point of Defendant's tractor trailer.

Among those witnesses was Mill Creek Fire Department Chief Mike Swanger.

When this issue was first broached by Plaintiffs' counsel during direct examination

of Chief Swanger, Defendant's counsel interposed the following objection:

Pls.' Counsel:      Did you note the location or do you recall where the end
of the trailer was located, was it in its lane or where was
it located?

Def.'s Counsel:     Objection, relevancy, Your Honor.

Pls.' Counsel:      Well, Your Honor, the witness has indicated that he saw
damage to the trailer, the rear portion of the trailer. So
I'm asking him where that portion of -- where the rear
end of the trailer was, if he  recalls, while it was stopped
at the bottom of Cramer Hill and his vehicle went by it.

15

| | |
|---|---|
| Def.'s Counsel: | Well, my understanding of the question was where the trailer was located on the roadway, and where that was is not where the accident happened, it's further down the road. |
| Pls.' Counsel: | I'm not suggesting that that's where the accident happened, Your Honor. |
| The Court: | **I think it's understood it's not where the accident happened.** We'll note the objection. We'll overrule the objection. You can either have it read back or  you can rephrase. |

(Trial Tr. vol. 1, 70)(emphasis added).  Clearly, the comments by Plaintiffs'

counsel and the Court disabused the jury of any inference that this witness was

attempting to opine as to where the accident happened.  We are quite secure in our

belief that the jury understood that the testimony went to the final resting point of

the trailer.  To the extent that the jury concluded, as it clearly did, that the

Defendant's trailer crossed the centerline of the road and struck Plaintiffs' vehicle,

this conclusion was derived from Plaintiffs' expert testimony.  Because it cannot be

reasonably concluded that the jury was in any way confused on this point, this

portion of Defendant's Motion will also be denied.

### 4.   <u>Verdict was Against the Weight of the Evidence</u>

Next, Defendant contends that the jury's verdict, and its apportionment of

damages in particular, was against the weight of the evidence.  In its brief,

Defendant argues that when the jury apportioned 85% of the liability to Defendant and 15% to Plaintiff Heather Eagle, "that [there] was no logical relationship to the evidence presented." (Def.'s Br. Supp. Mot. Post-trial Relief at 17). Defendant's argument in this regard is based on a supposition that we find unsupported by the record.

Defendant postulates that because each driver's standard of care required them to remain in their own travel lane, that the only negligence could be a driver's crossing of the double yellow center line. Therefore, Heather Eagle's liability could logically be either zero or equal to that of the Defendant and the jury could have returned only three different verdicts on liability: (1) 100% as to the Defendant, (2) 100% as to Plaintiff Heather Eagle; or, (3) liability split evenly. Defendant supports this argument by stating that the only evidence offered by either party of the other's negligence was the position of each vehicle at the time of the accident.

We do not agree that the position of the respective vehicles was the only type of negligence that could be found by the jury, and therefore we believe that the jury's apportionment of liability was appropriate. The jury heard a significant amount of testimony during the trial not only about the position of the two vehicles, but also about the circumstances that led up to the accident. If the parties were only focused on such a narrow issue as the positions of the vehicles at the point of

17

impact, they would not have questioned the witnesses, and the drivers in particular, on issues tangential to the vehicles' positions in the manner that they clearly did. As evidence that potential negligence went beyond vehicular positioning, extensive testimony by experts for both parties on topics such as truck braking, the relative speeds of the vehicles, and other topics related to reconstructing the accident scene was presented.  We will not speculate on how the jury considered either party negligent, beyond stating it was entirely possible for the jury to reach the verdict that it did.  The evidence adduced at trial revealed a complex series of events that took place prior to, during, and after the point of impact.  Defendant suggests a "black or white" construction of the evidence which is unwarranted.  Clearly, unless we are able to arrive at the conclusion that there was no logical basis for the liability apportionment by the jury, Defendant's argument is unavailing.  Since as noted we believe that such logical basis did exist, we will deny this portion of the Motion as well.

### B.   Motion for Remittitur & Motion for a New Trial on Damages Only

Finally, we will address simultaneously Defendant's request for a remittitur or in the alternative a new trial on damages.  At the outset of our analysis, we note that under Erie R. Co. v. Tompkins, a request for remittitur in a diversity action is

analyzed under both federal and state law.  304 U.S. 64 (1938).  Specifically:

> State substantive law controls what injuries are compensable and in
> what amount; but federal standards determine whether the award
> exceeds what is lawful to such degree that it may be set aside by order
> for new trial or remittitur.

Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 464,  (U.S. 1996);

see also Browning-Ferris Indus. v. Kelco Disposal, Inc., 492 U.S. 257, 259

(1989)(holding that in diversity cases district court determines whether verdict is

within confines of state law, and using federal law, whether remittitur should be

ordered).  Therefore, our analysis proceeds under Pennsylvania law, which indeed

closely mirrors the federal requirement.  Under either jurisdiction's law, for us to

grant a remittitur "the verdict must be so grossly excessive that it shocks the court's

sense of justice."  Batik v. Mine Safety Appliance Corp., 611 A.2d 1174, 1176 (Pa.

1992).  Further, it is an insufficient basis to reverse a jury's award of damages

simply because the court finds that an award is extremely generous, or that the

court would have found the damages to be considerably less. See Walters v.

Mintec/Int'l, 758 F.2d 73, 80 (3d Cir.1985).

Pennsylvania state courts have established a non-exclusive list of factors that

courts may consider in granting a remittitur.  These factors include:

> (1) the severity of the injury; (2) whether the injury is manifested by
> objective physical evidence or whether it is only revealed by the
> subjective testimony; (3) whether the injury is permanent; (4) whether

the plaintiff can continue with his or her employment; (5) the size of out-of-pocket expenses; (6) the amount of compensation demanded in the original complaint.

Carrozza v. Greenbaum, 866 A.2d 369, 383 (Pa. Super. Ct. 2004)(citing Harding v. Consolidated Rail Corp., 620 A.2d 1185, 1193 (Pa. Super. Ct. 1993)).

Obviously, we need only apply those factors which are relevant to the case sub judice.  Here, those factors are primarily:  (1) severity of the injury, (2) permanence of the injury; and, (3) whether the Heather Eagle could continue with her employment.  The other factors are either not disputed or not relevant to our determination.[3]

Before we analyze each of these factors, we must touch briefly on Defendant's trial strategy and its affect on the jury's verdict.  At trial, it quickly became apparent that Defendant's counsel's strategy was to focus primarily upon liability, and not damages.  Of the various witnesses who testified about the severity of Heather Eagle's injuries, none were intensively questioned by defense counsel, particularly when contrasted with his vigorous cross-examination of

---

[3] Whether objective evidence was used is not disputed by the Defendant.  As discussed in more detail below, Heather Eagle showed her injuries to the jury, which also saw contemporaneous photographs of those injuries.  Next, while there was no evidence in the record of Heather Eagle's out-of-pocket expenses, we do not believe that any expenses were relevant to the jury's determination. Finally, the amount of damages requested in the complaint ($10,000) is not relevant because Plaintiffs' counsel merely included the minimal jurisdictional amount to bring suit in the Huntingdon County Court of Common Pleas, where this action was originally filed prior to its removal to our docket.

Plaintiffs' liability witnesses.  As will be more fully discussed below, Defendant

declined the opportunity to conduct an independent medical examination ("IME")

of Plaintiff Heather Eagle.  This tactical omission placed Defendant largely at the

mercy of Plaintiffs' medical witnesses' testimony in the event of a finding of

liability which favored Plaintiffs.  Against this preliminary backdrop, we will

proceed to examine the relevant remittitur factors.

       **1.**    <u>**Severity**</u>

In support of its argument that Plaintiff Heather Eagle's injuries were less

severe than warranted by the verdict, Defendant states that "the evidence ...

showed that she conceived a child in, approximately, January 2003 (less than five

months after the accident occurred)."  (Def.'s Br. Supp. Mot. Post-trial Relief at

31).  Defendant further contends that Plaintiff Heather Eagle's relatively quick

return to school in February 2003 is evidence that her injuries were not severe

enough to warrant the substantial verdict rendered by the jury.  A proper resolution

of this point requires us to review in detail what evidence the jury heard regarding

Plaintiff Heather Eagle's injuries and their severity.

At trial, Plaintiffs presented the testimony of several physicians.  First to

treat Plaintiff Heather Eagle was Dr. Gregory J. Fulchiero ("Dr. Fulchiero") an

orthopaedic surgeon practicing in Altoona, Pennsylvania.  He examined her in the

trauma unit of Altoona Hospital in the hours after the accident.  In his trial

testimony he summarized her injuries as follows:

> I saw that this individual had sustained a compound fracture of her
> shin bone or tibia in the mid-portion of her shin bone or tibia of the
> right lower extremity.  Radiographs were also present which showed
> that [Eagle] had sustained a fracture of that same bone, but much
> closer and involving the knee joint.  She also showed films—had
> films there showing a fracture of the heel bone or calcaneus on the
> right, same side.  There was obvious swelling present. ... This
> individual also had a fracture of the opposite or contralateral on the
> inside or medial malleolus part of her ankle.  This was a fracture.

(Fulchiero Dep. Tr. at 20-21).  Subsequent to his evaluation, Dr. Fulchiero

immediately performed surgery on both of Plaintiff Heather Eagle's legs.  These

surgeries involved, inter alia, the insertion of eight-to-ten screws and a carbon fiber

bar in her left leg.  (Id. at 47).  Later, on August 29, 2002, several days after the

accident, Dr. Fulchiero performed two additional surgeries on Plaintiff Heather

Eagle.  Dr. Fulchiero explained in great detail the specifics of the surgeries he

performed on her.  He was only briefly cross-examined by defense counsel, and

not at all about the severity of her injuries (other than to establish that she had

suffered no apparent head injury).

More succinctly, Plaintiff Heather Eagle's next treating physician, Dr.

Douglas E.R. Roeshot ("Dr. Roeshot"), an orthopaedic surgeon practicing in State

College, Pennsylvania, stated in his trial testimony that "It was pretty obvious these

are pretty severe injuries [suffered by Heather Eagle]."  (Roeshot Dep. Tr. at 29).

Finally, the jury also heard testimony from Dr. Richard S. Buza ("Dr. Buza"), a family physician who treated Plaintiff Heather Eagle both before and after the accident.  Dr. Buza first examined her on September 11, 2002, and found that "she really had a lot of problems with multiple fractures in both legs ... ." (Buza Dep. Tr. at 13-14).  Dr. Buza also discovered that "the problem that had not be addressed at that point were [sic] the multiple areas of retained glass and debris under the skin." (Id. at 14).  On September 13, 20, and 30, October 28, and November 14, 2002 Dr. Buza treated Plaintiff Heather Eagle to remove the debris from underneath her skin. He also performed other procedures to remove her sutures following these procedures.  After significant testimony about these procedures and related scarring, counsel for the Defendant chose not to address these issues on his cross-examination.  He was instead concerned with, inter alia, Dr. Buza's prescription of Paxil to Plaintiff Heather Eagle, her child, her employment, and whose idea it was to photograph her during Dr. Buza's course of treatment.  (Id. 44-50).

Likely just as persuasive to the jury as her physicians was Plaintiff Heather Eagle's own testimony about the severity of her injuries.  She explained not only the immediate impact of her injuries the night of her accident, but about her recovery. The following portion of her testimony is instructive in this regard:

Answer:        And I remember crying, and I remember just -- I was crying so much, and I was just begging -- like I just wanted to pass out; but I wasn't, obviously. And I remember saying to my dad, just cut my leg off, just cut it off, just get me out of this car. That's all I remember. I remember them saying LifeFlight was coming, and I remember both of my arms, they were trying to get IVs started in my arms.

...

Question:     And where -- where was the pain that you were feeling? Was it anyplace particular or could you --

Answer:        I mean it was in my arm, but the majority was in my legs because I remember once I got out, I was so afraid of somebody bumping into my legs just because any time it moved it hurt.

...

Question:     Did they then realign the leg?

Answer:        Yeah, I remember two people got on each side and like said squeeze our hands.

Question:     How did that feel?

Answer:        It hurt, I started crying, and probably left out a loud scream I think. It hurt.

(Trial Tr. vol. 3, 38, 41, 45, March 9, 2005).  Plaintiff Heather Eagle also testified about how debris from the accident was imbedded in her body and the pain she was in after her first two surgeries that night.  (Id. at 49-50).  Beyond the initial shock, she testified at length about her recovery.  She told the jury about, inter alia, her use of a catheter, her scarring, and the need for her wounds to be repeatedly

24

dressed.

When she was released from the hospital approximately ten days after the

accident, Plaintiff Heather Eagle was transported by ambulance and wheelchair.

She described to the jury her experience at home:

> Question:     When you arrived home, Heather, what were the
>                     conditions of your legs?
>
> Answer:       I could not bend my right leg at all.  I was non-weight
>                     bearing on both of my legs, and I came home in an
>                     ambulance on a stretcher, and then basically by
>                     wheelchair.
> ...
>
> Question:     What type of care did you require at that time while at
>                     home?
>
> Answer:       I had to have around-the-clock care the whole time.
>                     Somebody had to be there.  Garry was there at night.
>                     And somebody would come down around three o'clock
>                     in the morning usually to take his shift over, a friend or
>                     his grandmother or my sisters and my mom did it for
>                     awhile.  And then my mom would come – when Garry
>                     would come home for breakfast and my mom would
>                     come around usually seven or eight in the morning.

(Id. at 65, 66-67).  Because she is a nurse, Plaintiff Heather Eagle described in detail

the relevant aspects of her recovery.  Her testimony in this regard was clearly both

comprehendible and impactful.  At the conclusion of her direct testimony, she

showed the jury the extensive scarring on her legs, arms and shoulder that had

remained visible some two and one-half years after the accident.  Defendant did not

object to that display.

As according to what was clearly Defendant's intention to emphasize liability and not damages at trial, Plaintiff Heather Eagle was not subjected to extensive cross-examination on damages. Defendant's counsel did ask her about when she stopped taking prescription painkillers ("I might have taken a Tylenol here or there, but I tried to get off the pain medication as soon as possible."), when she returned to school ("February 5th, 2003"), and when she conceived a child (January 2003). (Id. at 106-07). The questions by Defendant's counsel in no way minimized what the jury could only have perceived to be significant and severe injuries. In fact, we do not believe that additional questions would have depreciated the seriousness of her condition since it is beyond peradventure that Plaintiff Heather Eagle sustained grave and permanent injuries as a result of this accident.

To summarize, having reviewed Plaintiff Heather Eagle's testimony and the previously noted testimony from her three physicians, we believe that there was ample uncontroverted evidence before the jury from which it could discern the severity of Plaintiff Heather Eagle's injuries.

## 2. __Permanence of Plaintiff Heather Eagle's Injuries__

The next relevant factor is whether the injuries are permanent. Notably, Defendant offers no specific evidence to refute the permanence of Plaintiff Heather

Eagle's injuries.  Indeed, Defendant is at a disadvantage in this regard as no IME,

as previously noted, was ever performed.

To be sure, Dr. Roeshot testified on cross-examination that he could not be

certain that future surgeries would be necessary.  (Roeshot Dep. at 82).  However,

the jury heard unrebutted testimony that this then-25 year old woman had problems

lifting, could not run, could not climb, that she had extensive scarring, and that she

had an altered gait, all as a result of the injuries suffered by her in this accident.

There was every indication that these limitations were permanent.  As she explained

to the jury:

> Question:   How does your injuries [sic], your current condition,
>             affect you at work; are you able to do your job?
>
> Answer:     I can do my job. If I was on another floor I probably
>             wouldn't be able to due to the heavy lifting. My floor
>             obviously there's not a lot of heavy lifting. There's times
>             where we have -- the patients have emergency bells in
>             their room. If they ring, I can't run, I just tell the other
>             nurse I'll be there. I try to walk as fast as I can.  The
>             babies have code alert bracelets on. If somebody would
>             try to steal them, if it would fall off, whatever, it alarms,
>             and I can't run to see where the baby is when they go off
>             either, it's just I'll get there when I get there; and they all
>             know that, so. . .
>
> Question:   How about at home, how does your condition affect your
>             life at home as far as what you can do and can't do?
>
> Answer:      As far as housework, I can pretty much do everything. I
>             can't climb on stuff. I have to have -- we have a pretty tall

27

Christmas tree, for example, and I can't decorate it. I
used to be able to.

...

Question:     But with your -- do you have any feelings concerning the
abrasions or the tattooing and marks on your arms, the
shoulder; how does that make you feel?

Answer:       I used to wear tank tops all the time, I don't like to wear
them. I get even comments just every day, what's wrong
with your leg, why are you walking like that; do you know
that that's not good on your leg; you're going to destroy
your hip, you're going to destroy your knee. I know, but
there's nothing I can do. Just comments like that and
people looking, but I just have to keep my chin up.

Question:     You mentioned Connor [Plaintiffs' son] and running after
him. For example, would you be able -- would you be
able to help him ride a bicycle or learn to ride a bicycle?

Answer:       Probably not.

Question:     Why?

Answer:       Because it requires being able to run and stay up with him
and, of course, I think about this stuff all the time.

(Trial Tr. vol. 3, 90, 91).  It is clear from both this particular excerpt as well as the

entirety of Plaintiff Heather Eagle's testimony, that her injuries affect her life on a

constant and daily basis.  The altered gait as testified to by her was readily evident

as she proceeded to and from the witness stand.  There was no evidence that

Plaintiff Heather Eagle was malingering or magnifying her injuries.  There was also

no reason for the jury to find that the physical limitations as stated by her were not

28

permanent.

### 3.      Continuance of Employment

The final factor we will address concerns Plaintiff Heather Eagle's employment.  At the time of the accident, she was in the midst of training to become a nurse.  Despite her injuries, she missed only one semester of school and was able to receive her certification as an RN.  She testified that she works full-time as a nurse.  While Plaintiffs presented no testimony regarding a diminution of Plaintiff Heather Eagle's future earning capacity, she did testify as previously noted that her injuries hamper her ability to perform some of her duties as an RN. Specifically, she stated that she is unable to run in the hospital and that another nurse must be directed to respond to patients' emergencies.

We will decline Defendant's invitation to have us place great emphasis upon this particular factor.  We believe it laudable under the circumstances that Plaintiff Heather Eagle completed her schooling and commenced work.  Again and as previously noted, it is evident that she is afflicted daily with a degree of pain and discomfort, and that she has limitations which make her job duties more difficult, but not impossible.  Thus, we place little weight on this factor as it relates to the request for remittitur.

### 4.      Punitive Nature of the Verdict

Finally, Defendant contends that remittitur is necessary because the jury improperly considered punitive factors in awarding compensatory damages.  In support, Defendant notes that Plaintiffs' counsel argued to the jury in his closing that the Defendant was a large company and operator of "big orange trucks rolling up and down the highway, bright orange cabs, bright orange trailers."  (Trial Tr. vol. 6, 38, March 14, 2005).

We find the Defendant's argument unavailing in light of our previously completed review of the severity and permanence of Heather Eagle's injuries. While another jury might not have been as generous, and while we might find the verdict rendered to be in the higher range of permissible awards, the Court cannot reasonably conclude that a miscarriage of justice resulted.  Defendant's surmise that the jury impermissibly awarded at least in part punitive damages ignores the largely unrebutted medical testimony in this case.  We do not believe that Plaintiffs' counsel's single and mildly hyperbolic reference to "big orange trucks" incited the jury in the fashion suggested by Defendant, to an extent that it awarded de facto punitive damages.

Finally, we must note that the jury's verdict was reached in a careful and appropriate fashion.  The jury deliberated for nearly three days before reaching its verdict.  It never once reported a deadlock, nor was there an indication that it was

30

in any way confused about its duties.  Accordingly, it was obvious to us that the jury performed its duties in workmanlike fashion, and with dedication to its task.  It is well to reiterate that reasonable judges or lawyers with training and experience in the area of personal injury law might differ as to whether the jury's verdict was in the high range given the facts of this case.  However, we cannot find that the verdict so shocks the conscience to a degree that either remittitur or a new trial on damages is appropriate.  As a result, we will deny that portion of Defendant's Motion seeking this relief.

## C.    <u>Conclusion</u>

In closing, we find no reason to disturb the jury's verdict as entered on March 23, 2005, nor do we believe that a new trial is warranted.  This trial featured "dueling experts" on the issue of liability.  Once that issue was resolved by the jury in Plaintiffs' favor, Defendant's trial strategy, which involved presenting no expert medical testimony of its own, left it splayed open and susceptible to a significant verdict.[4]  That is precisely what took place, and for all the reasons set forth in the

---

[4] Our several references to Defendant's trial strategy should not in any way be read as casting aspersions on defense counsel.  Defendant obtained what it clearly regarded as a strong expert report which concluded that it was not at fault.  It was thus not at all inappropriate under that circumstance for Defendant to focus on the liability issue rather than to attempt to controvert the gravity of Plaintiff Heather Eagle's injuries.  Defendant's counsel was professional, zealous, and impressive in his advocacy.  However, the strategy which Defendant elected, while logical, was not without risk.  Having failed to convince the jury that it was not at fault, Defendant was essentially "lashed to the mast" as Plaintiffs' largely unrebutted medical testimony on damages rolled into the record.

foregoing analysis, Defendant's Motion will be denied in its entirety.


**NOW, THEREFORE, IT IS ORDERED  THAT:**

1.      Defendant's Motion for Post-Trial Relief (Rec. Doc 84) is DENIED.



s/ John E. Jones III
John E. Jones III
United States District Judge